IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Timmy F. Capps,                    )
                                   )       Civil Action No. 6:08-0188-HFF-WMC
                    Plaintiff,     )
                                   )       **REPORT OF MAGISTRATE JUDGE**
          vs.                      )
                                   )
Michael J. Astrue,                 )
Commissioner of Social Security,   )
                                   )
                    Defendant.     )
_____)

          This case is before the court for a report and recommendation pursuant to

Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this

District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

          The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3)

of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial

review of a final decision of the Commissioner of Social Security denying his claims for

disability insurance benefits and supplemental security income benefits under Titles II and

XVI of the Social Security Act.


**ADMINISTRATIVE PROCEEDINGS**

          The plaintiff protectively filed applications for disability insurance benefits

(DIB) and supplemental security income (SSI) benefits on August 5, 2004, alleging that he

became unable to work on May 1, 2000.  The applications were denied initially and on

reconsideration by the Social Security Administration.  On April 15, 2005, the plaintiff

requested a hearing.  The administrative law judge, before whom the plaintiff, his attorney,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined
to consent to disposition by the magistrate judge.

and his wife appeared on May 9, 2007, considered the case *de novo*, and on June 14, 2007, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on December 14, 2007. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant met the insured status requirements of the Social Security Act through December 31, 2005.
>
> (2)    The claimant has not engaged in substantial gainful activity since May 1, 2000, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq.*).
>
> (3)    The claimant has the following severe combination of impairments: obesity and rectal warts (20 CFR 404.1520(c) and 416.920(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work.
>
> (6)    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)
>
> (7)    The claimant was born on October 18, 1967 and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).
>
> (8)    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.064).
>
> (9)    Transferability of job skills is not material to the determination of disability because applying the Medical-

2

Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10)   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

(11)   The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2000 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing

3

substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4ᵗʰ Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4ᵗʰ Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4ᵗʰ Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4ᵗʰ Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance.  If there is evidence to justify a refusal to direct
a  verdict were the case before a jury, then there is "substantial
evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 32 years old as of his alleged onset date and 39 years old on the date of the ALJ's decision (Tr. 28-29, 55, 233).  He has a tenth-grade education (Tr. 93, 233) and past work experience as an auto mechanic, construction machine operator and utilities construction laborer (Tr. 73-80, 88, 96-102, 104-06).

### *Medical Evidence*

The record reveals that on June 19, 2000, the plaintiff presented to Dr. Henry Jordan, who found that the plaintiff had a giant condyloma on both cheeks in his perianal area.  Dr. Jordan recommended Podophyllin (medication for warts), hoping to get the plaintiff's warts "to a manageable situation" where he could operate.  He noted that the plaintiff's warts had been present for about 10 years and were slowly growing.  He found no evidence of any degeneration into cancer (Tr. 133).

On June 30, 2000, Dr. Jordan saw the plaintiff again and noted that he was "making progress and doing better" (Tr. 133).  On July 10, 2000, Dr. Jordan noted that Podophyllin was applied again and that the plaintiff was "making slow progress" (Tr. 133).  On July 14, 2000, the plaintiff again presented to Dr. Jordan, who noted that he "ha[d] too

5

much swelling" but no active infection (Tr. 133).  On July 28, 2000, Dr. Jordan noted that the plaintiff's warts were shrinking (Tr. 133).

On September 26, 2000, Dr. Jordan found that the plaintiff's warts "were bleeding and painful and preventing him from being able to work."  He stated that they would need to be surgically removed.  He also stated that these were "the largest condyloma that [he had] seen in [his] career" and that the plaintiff would need to be hospitalized for a day or two following surgery.  He also said that the plaintiff would need a proctoscopy to be sure they had not grown into his rectum.  He recommended that the plaintiff contact the Vocational Rehabilitation office to see if they would assist him so he could have this done and return to work (Tr. 133).

On October 26, 2000, the plaintiff presented to Dr. Scott Waguespack with complaints of weight gain.  He reported that his Medicaid was approved.  He also reported that he fell asleep during the day.  Dr. Waguespack found that he was alert and oriented and obese.  He also found that his breathing was "barely audible," but thought "he [was] holding back" (Tr. 136).

On December 12, 2000, Dr. Waguespack treated the plaintiff for a head and chest cold with medications and recommended a sleep study (Tr. 134).

On January 9, 2001, the plaintiff presented to Dr. Gowdhami Mohan for apnea, frequent nocturnal awakenings, excessive daytime sleepiness and dyspnea on exertion.  Dr. Mohan noted that the plaintiff smoked 1½ packs of cigarettes per day.  He found that the plaintiff was 5'10" and weighed 313 pounds. He found distant breath sounds, wheezing and no bronchial breathing or rhonchi.  He diagnosed sleep-related breathing disorder, chronic obstructive pulmonary disease (COPD) and tobacco abuse.  He recommended overnight polysomnography, pulmonary function tests and smoking cessation.  He prescribed Combivent (a bronchodilator) (Tr. 143-46).

6

On January 15, 2003, the plaintiff presented to the emergency room with complaints of left leg redness and pain during the previous three or four days. Dr. Brad Swenson found that the plaintiff had a large area of redness and erythema over his right medial inner thigh, which was indurated, tender and warm. He said that it was approximately the size of a standard sheet of paper in circumference. He found no redness or fluctuance into the plaintiff's perineum. He also found a large number of condylomata in his perineum and rectal area, no rectal pain, and no tenderness/redness/swelling in his scrotum. He administered Morphine. He diagnosed right upper medial leg cellulitis and a large number of perineal and rectal condylomata acuminatum. He prescribed Augmentin (an antibiotic) and Vicodin (a narcotic) (Tr. 152-56).

On January 19, 2003, the plaintiff returned to the emergency room with complaints of right leg pain. He reported worsening redness, pain and swelling in the proximal aspect of his right thigh and groin. Dr. Swenson found that the plaintiff was well-developed, well-nourished and overweight. He found that the plaintiff had a large amount of condylomata in his perianal and rectal areas, which had some cracks through the skin. He also found a large amount of induration and redness over the medial proximal aspect of his right thigh and groin area, no crepitance and dark coloration of the skin. He diagnosed right groin and leg cellulitis, admitted the plaintiff to the hospital, and recommended treatment with Ampicillin and Clindamycin (antibiotics) (Tr. 173-76).

The following day, Dr. David Martoccia examined the plaintiff. He noted that the plaintiff was working under his mobile home and subsequently experienced swelling and redness in his right thigh. He also noted that the plaintiff presented twice to the emergency room for treatment. The plaintiff reported worsening pain and swelling. Dr. Martoccia further noted that the plaintiff smoked 1½ packs of cigarettes per day for 20 years. He found that the plaintiff was awake, alert and conversing. He found nontender reflexes to deep palpation, obese abdomen with good bowel sounds, and no palpable abdominal

7

masses, organomegaly or suprapubic tenderness.  He found the plaintiff had large cauliflower lesions between the scrotum and anus, and a very inflamed and erythematous right medial thigh with raised areas of edema and striations.  He noted that the inflamed area extended from the plaintiff's groin crease to the proximal two-thirds of the thigh.  He noted no fluctuants, crepitance or serious fluid discharge, and found in the middle of the plaintiff's cellulitis a small area that appeared to be an insect bite.  He diagnosed cellulitis of the right thigh with recent exacerbation of increased pain and edema and sleep apnea. He stated that the plaintiff's cellulitis was probably due to a superficial skin defect that became infected.  He prescribed antibiotics and recommended surgical evaluation (Tr. 170-72).

An x-ray of the plaintiff's right thigh on January 20, 2003, showed diffuse soft tissue swelling, but was otherwise negative (Tr. 181).  That same day, Dr. Martoccia diagnosed a large right thigh abscess and performed incision, debridement and irrigation of the abscess (Tr. 168-69).

On January 22, 2003, Dr. T. Steve McElveen diagnosed large right thigh wound secondary to abscess with some necrosis and performed right upper thigh wound debridement, irrigation, and dressing change with packing under anesthesia (Tr. 166-67). On January 27, 2003, Dr. McElveen diagnosed large right thigh abscess with cellulitis and systemic symptoms secondary to spider bite, anal condylomata, sleep apnea and oral candidemia secondary to antibiotic therapy.  He instructed the plaintiff to do no lifting or straining, prescribed medications, and discharged him from the hospital (Tr. 157-58).

On February 21, 2003, the plaintiff was treated on an emergency basis for an upper respiratory infection and right otitis media with medications (Tr. 184-88).

On October 14, 2003, the plaintiff presented to the emergency room following a motor vehicle accident.  He complained of mild neck and left knee pain.  Dr. James Britenburg found minimally tender cervical spine, some tenderness in the left paracervical

8

muscles and trapezius, fairly good neck ranges of motion with mild pain, and no tenderness in the chest wall, lumbar spine, or knee. He noted that the plaintiff walked without a limp and had normal neurological functioning. A cervical spine x-ray was negative. He diagnosed motor vehicle crash with multiple areas of musculoskeletal strain and prescribed Vicodin and Flexeril (a muscle relaxant) (Tr. 189-94).

On October 1, 2004, Dr. Mary Hammond examined the plaintiff at the request of the Commissioner. The plaintiff reported that he had sleep apnea and could not work. He also reported that he could not clean himself and his wife had to stay home and clean his bottom. He stated that he did not want surgery because it would be too painful and his warts might come back. He said he had been obese for a long time and "[did not] want to relate that to his apnea." He stated that his daily activities included walking a mile per day, carrying his children to the bus stop and cutting his grass. He also stated that he had smoked 2½ packs of cigarettes per day until he quit about a year previously. Dr. Hammond found that he was "severely obese" at 337 pounds and 70 inches tall. She found that his "abdomen was so obese there was no way [she] could fully examine him." She found normal extremities, negative straight leg raising tests, and a "huge area of warts" on his buttocks, none of which looked infected. She stated that these caused him difficulty and required that he use a "donut" pillow. She diagnosed sleep apnea, possibly secondary to obesity, and severe rectal warts (Tr. 195).

The plaintiff returned to Dr. Mohan for follow-up on October 4, 2004. Dr. Mohan noted that the plaintiff used a continuous positive air pressure (CPAP) machine, but had trouble using the mask. He also reported a weight gain of 20-30 pounds and dyspnea on exertion. He indicated that he quit smoking a year earlier and became short of breath after walking half a block. Dr. Mohan noted that the plaintiff weighed 338 pounds. He found that the plaintiff demonstrated no extremity cyanosis, clubbing or edema, and had normal neurological functioning. Dr. Mohan diagnosed sleep apnea with difficulties using

9

a CPAP mask, obesity and COPD. He recommended a new CPAP mask/headgear, weight reduction, exercise and pulmonary function tests. He prescribed Combivent and Advair (a bronchodilator) (Tr. 201-02).

On March 8, 2005, the plaintiff presented to Sarah Long, a nurse practitioner, for follow-up concerning his sleep apnea and COPD. Ms. Long diagnosed sleep apnea, noting that the plaintiff's symptoms were "well controlled" with a CPAP machine, and COPD. She recommended weight loss and prescribed Advair (Tr. 200).

On March 28, 2005, Dr. Hugh Clarke, a State agency physician, reviewed the medical evidence and found that the plaintiff could perform medium work[2] that did not require climbing of ladders, ropes or scaffolds, more than occasional climbing of ramps and stairs, or more than frequent balancing, stooping, kneeling, crouching and crawling. He also found that the plaintiff should avoid concentrated exposure to hazards (Tr. 205-12).

### Hearing Testimony

At the administrative hearing, the plaintiff testified that he drove a car three times per week to church, to the grocery store, or to pay bills (Tr. 236). He testified that he was fired from his previous job when his employer discovered he underwent treatment for sleep apnea (Tr. 243, 257). He also testified that he was unable to work due to sleep apnea, shortness of breath, and rectal warts (Tr. 244). He stated that his warts caused burning pain, which he relieved by taking a bath (Tr. 245-46, 248, 268). He stated that he started getting the warts when he was approximately 20 years old. He said he worked with them for many years and took no medications for them (Tr. 245-46). He also said that the last time he saw a doctor for them was when he saw Dr. Hammond in October 2004 (Tr.

---

[2]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." *Id*. §§ 404.1567(c), 416.967(c).

10

247).  He stated that he did not want to undergo surgery for the warts because there was a chance they could grow back (Tr. 248).

The plaintiff testified that he could lift 35-40 pounds "for a little while," but not on a repetitive basis because he would "get short winded pretty quick" (Tr. 249-50).  He also testified that he had difficulty bending (Tr. 250).  He stated that he could stand for 15-20 minutes, but then had to sit down for about five minutes (Tr. 251).  He said he could not sustain alternating between sitting and standing for eight hours (Tr. 251).  He said that he could walk from his house to his van (Tr. 251).  He stated that his wife cooked and cleaned (Tr. 252).  He also stated that he did not do any housekeeping or yard work (Tr. 253).  The plaintiff testified that his wife helped him with his personal care, including getting dressed (Tr. 253, 257).  He also testified that he used to smoke, but quit three years previously (Tr. 254A).  He stated that he wore a pull-up diaper (Tr. 260).  He also stated that after a bowel movement, he had to take a bath and his wife would blot the area around his warts dry (Tr. 261, 263).  The plaintiff testified that he tried to use a donut pillow to sit, but it did not help (Tr. 264).  He said that he had no energy (Tr. 266, 268).  He stated that in 2004 he was not able to cut his grass or walk a mile as Dr. Hammond's report indicated (Tr. 266-67).

The ALJ indicated that the plaintiff's rectal warts were "obviously a major impairment" (Tr. 273).  He stated that he did not think "it [was] an issue of sending him out for [a] [consultative examination]," but the issue was "what treatment [was] available, what's the prognosis after treatment, what does the treatment entail, are there topical ointments, are there topical creams, are there pills, you know, what can be done in this situation" (Tr. 273-74).  He also stated that:

> Medicine [was] advancing at exponential rates in terms of the technology used and everything. I think it just might be smart to get someone's opinion who's a whole lot smarter on this than mine.  It doesn't dictate what I do but because we don't– and again, if we had a report coming in saying he has a MMI with his rectal warts, he's going to have them this size or bigger for

the rest of his life, he can't do anything for two hours without having to deal with them, then that would, that would help me. We don't have that in the record, at least not that I saw. (Tr. 275)

* * *

So that's what I'm going to do.  We'll find a [medical expert]. I think a proctologist would be the appropriate person, either that or a dermatologist. That might be the first question. Do we need to have the opinions of a dermatologist or a proctologist? It's not an issue of sending him out for confirmation of the diagnosis; the diagnosis is correct. Ths issue is treatability and practicality–I mean, if it comes back saying, you know, we offer a dozen different donut sizes, there should be a donut that fits this and fits his body weight that would allow him to sit comfortably with no compression or the warts, you know, not causing them to leak or anything. Then the issue is can he do a sedentary job and we look at the energy level of the swelling and the sleep apnea and everything else and, you know, and figure it out. But you know, we're dealing with a young individual here, and I think we need to get those answers, at least about the rectal warts.  (Tr. 277-78)

### Evidence Submitted to the Appeals Council

The plaintiff submitted additional evidence to the Appeals Council with his request for review of the ALJ's decision, including an affidavit from Glenda Capps, his mother, and a statement from Dr. Jordan (Tr. 8, 215-25).

In Dr. Jordan's statement dated September 12, 2007, he indicated that he treated the plaintiff between June and September 2000 for anal warts.  He said these could be expected to trap feces, creating a cleaning issue after every bowel movement, necessitating the use of a wash cloth, possibly a sitz bath, and a method for drying the area afterward.  He stated that the plaintiff needed "to be in a home environment to take care of this."  He also said that the warts could cause irritation from perspiration, pressure or friction from walking, standing, or sitting.  He noted that the plaintiff experienced episodes of bleeding from these giant warts.  He stated that, because of the size, location and irritation

problems from the warts, the plaintiff could not engage in the activities cited above. He stated that the plaintiff's warts kept him from working (Tr. 225).

In an affidavit dated September 13, 2007, Ms. Capps stated that she paid for all of the plaintiff's office visits to Dr. Jordan because he did not have any money. She also stated that he did not have any insurance. She further stated that she did not have the money to pay for the operation or have insurance that would pay for it (Tr. 224).

## ANALYSIS

The plaintiff has a tenth-grade education and past work experience as an auto mechanic, construction machine operator, and utilities construction laborer. He was 32 years old as of his alleged onset date and 39 years old on the date of the ALJ's decision. He alleges that he has been disabled since May 1, 2000, due to sleep apnea, emphysema, and rectal warts. The ALJ found that the plaintiff had the following severe impairments: obesity and rectal warts. The ALJ further found that the plaintiff retained the residual functional capacity ("RFC") to perform sedentary work (Tr. 18). The plaintiff argues that the ALJ erred by (1) failing to follow his own directive of obtaining further medical testing and assessments; (2) failing to properly evaluate the opinion of treating physician Dr. Jordan; (3) failing to properly evaluate his credibility; (4) failing to follow SSR 82-59 in finding that he refused prescribed treatment; and (5) failing to follow Social Security Ruling ("SSR") 96-7p in determining the reasons for his lack of treatment.

### *Further Medical Testing*

The plaintiff first argues that the ALJ did not sufficiently develop the record because he failed to obtain a consultative examination. This court agrees. "In this Circuit, it is clear that the ALJ has 'a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate.'" *France v. Apfel*, 87

F.Supp.2d 484 489 (D. Md. 2000) (quoting *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir.

1986)).  The regulations provide in pertinent part:

> e) Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.

>> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

>> (2) We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary findings.

> (f) Need for consultative examination. If the information we need is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense. See §§ 404.1517 through 404.1519t for the rules governing the consultative examination process. Generally, we will not request a consultative examination until we have made every reasonable effort to obtain evidence from your own medical sources. However, in some instances, such as when a source is known to be unable to provide certain tests or procedures or is known to be nonproductive or uncooperative, we may order a consultative examination while awaiting receipt of medical source evidence. We will not evaluate this evidence until we

have made every reasonable effort to obtain evidence from
your medical sources.

20 C.F.R. § 404.1512 (e), (f).

The ALJ stated as follows in the hearing: "I have the statutory requirement to develop the records as much as possible. We don"t have a whole lot of development in this area, so I thing we need to get those answers and then figure out what we're going to do" (Tr. 277). He further stated, "[R]ectal warts isn't something in this job that I've encountered before. . ." (Tr. 273), and "I think it just might be smart to get someone's opinion who's a whole lot smarter on this than mine" (Tr 275). The ALJ told the plaintiff and his counsel, "I think a proctologist would be the appropriate person, either that or a dermatologist" (Tr. 277). The ALJ continued, "It's not an issue of sending him out for confirmation of the diagnosis; the diagnosis is correct. The issue is treatability and the practicality . . ." (Tr. 277-78). Lastly, the ALJ stated, "Well, and that's ... a legitimate question [regarding the plaintiff's claim that he is not able to adequately clean the anal area after a bowel movement]. It really is because, you know you can't expect to . . . take your wife with you to work . . . to help in that situation . . . I just would feel better if we get an expert to say, I see these all the time and treat them. . ." (Tr. 278).

However, after the foregoing discussion at the hearing, the ALJ did not request a consultative examination nor did he request more information from the plaintiff's treating physician. It is clear from the foregoing that the ALJ felt that the information in record was inadequate. The plaintiff submitted to the Appeals Council a statement from his treating physician dated September 12, 2007, in which Dr. Jordan indicated that he treated the plaintiff between June and September 2000 for anal warts. He said the warts could be expected to trap feces, creating a cleaning issue after every bowel movement, necessitating the use of a wash cloth, possibly a sitz bath, and a method for drying the area afterward. He stated that the plaintiff needed "to be in a home environment to take care of this." He

15

also said that the warts could cause irritation from perspiration, pressure or friction from walking, standing, or sitting. He noted that the plaintiff experienced episodes of bleeding from these giant warts. He stated that, because of the size, location and irritation problems from the warts, the plaintiff could not engage in walking, standing, or sitting. He stated that the plaintiff's warts kept him from working (Tr. 225). Upon remand, the ALJ should be directed to consider Dr. Jordan's statement along with the other evidence of record. Further, the ALJ should be directed to recontact Dr. Jordan for any additional information that is needed and to order a consultative examination of the plaintiff if the information provided by Dr. Jordan is insufficient.

### *Treating Physician*

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4)

the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion.  20 C.F.R. § 404.1527(d)(2)-(5).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion.  SSR 96-2p, 1996 WL 374188, *5.  As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

As set forth above, in Dr. Jordan's statement dated September 12, 2007, he stated that the plaintiff needed "to be in a home environment to take care of" the issues created by the warts.  He further stated that because of the size, location, and irritation problems from the warts, the plaintiff was prevented from walking, standing, or sitting.  He stated that the plaintiff's warts kept him from working (Tr. 225).  Dr. Jordan's statement was submitted to the Appeals Council, which considered the evidence and found "no reason under our rules to review the Administrative Law Judge's decision" (Tr. 5).  The Appeals Council gave no reason for rejecting Dr. Jordan's statement.

In *Harmon v. Apfel*, 103 F.Supp.2d 869 (D.S.C. 2000), the Honorable David C. Norton, United States District Judge,[3] stated:

> [A]lthough the Appeals Council's decision whether to grant or deny review of an ALJ's decision may be discretionary as well as unreviewable, and the regulations do not require the

---

[3]Judge Norton is now the Chief Judge for the District of South Carolina.

> Appeals Council to articulate a reason for its decision not to grant review, a reviewing court cannot discharge its statutory function of determining whether the findings of the Commissioner are supported by substantial evidence when the Appeals Council considered evidence that the ALJ did not have the opportunity to weigh, and rejected that new, additional evidence without specifying a reason for rejecting it or explicitly indicating the weight given to the evidence.

*Id.* at 874.

Here, the ALJ did not have the benefit of considering Dr. Jordan's statement. As argued by the plaintiff, there is no evidence in the record contradicting Dr. Jordan's statement that the plaintiff would need to be at home to do the necessary cleaning after a bowel movement. Further, there is no evidence contradicting Dr. Jordan's statement that perspiration, walking, and sitting can cause irritation to this area (Tr. 225). As the Appeals Council gave no reason for its rejection of the evidence, this court cannot say that substantial evidence supports the Commissioner's findings. As discussed above with regard to the plaintiff's first allegation of error, it is clear that the ALJ needed more information in order to determine whether the plaintiff is disabled. Based upon the foregoing, upon remand, the ALJ should consider the foregoing evidence, along with all the other evidence in the record, and articulate his assessment of Dr. Jordan's opinion, so that this court may determine whether the Commissioner's decision is supported by substantial evidence. *See King v. Barnhart*, 415 F.Supp.2d 607, 610-11 (E.D.N.C. 2005) ("If, upon consideration of the entire record, including the new evidence, the district court cannot conclude that the ALJ's decision was supported by substantial evidence, remand should be ordered. If, for example, the new evidence contains an opinion of a treating physician that claimant was disabled, that opinion not having been addressed or contradicted by other evidence in the record, the great weight accorded to such an opinion would require remand.").

***Credibility***

The plaintiff next argues that the ALJ failed to properly assess his credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility."  *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight."  SSR 96-7p, 1996 WL 374186, *4.

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

19

      (3)      factors that precipitate and aggravate the symptoms;

      (4)      the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

      (5)      treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

      (6)      any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

      (7)      any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ stated that "after considering the evidence of record, the undersigned finds that [the plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely credible" (Tr. 19).

The ALJ first considered the plaintiff's daily activities, noting that the activities the plaintiff testified to at the hearing (walking to his van from the house, no yard or house work) were inconsistent with the daily activities he described to Dr. Hammond in October 2004 (walking a mile per day, carrying his children to the bus stop and cutting his grass) (Tr. 19-20, *see* Tr. 195, 251-53). A claimant's daily activities are a valid consideration for an ALJ in evaluating credibility.

The ALJ further found as follows:

While undoubtedly the claimant is uncomfortable from anal warts he has not complied with medical treatment. The claimant has been advised to use an inflatable "donut" when seated to alleviate pressure on his warts. He testified at his hearing that "he tried someone else's at church" and that it did

20

> not work. He has been advised that warts need to be surgically removed. 20 C.F.R. 404.1530 and 416.930 require that an individual must follow prescribed treatment prior to receiving benefits, unless there are acceptable reasons for failing to follow prescribed treatment. In the instant case, it appears from the record and testimony that the claimant has in no way complied with his prescribed treatment nor sought further treatment for his condition.

(Tr. 20).

The Commissioner's regulations and rulings state that a claimant who would otherwise be found disabled, but fails without justifiable cause to follow treatment prescribed by a treating source which the Agency determines can be expected to restore the claimant's ability to work, cannot by virtue of such "failure" be found to be disabled. *See* 20 C.F.R. §§ 404.1530, 416.930. The Agency may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist: (1) the evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity; (2) the impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; (3) treatment which is clearly expected to restore capacity to engage in any substantial gainful activity has been prescribed by a treating source; and (4) the evidence indicates that there has been a refusal to follow prescribed treatment. "When the [Agency] makes a determination 'failure,' a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable. SSR 82-59, 1982 WL 31384, at *1.

The plaintiff argues that the ALJ violated SSR 82-59 because the finding that he did not follow prescribed treatment is not supported by substantial evidence. Specifically, the plaintiff argues that conditions 3 and 4 were not met. This court agrees.

On September 26, 2000, after treating the plaintiff's warts for several months, Dr. Jordan's treatment notes state:

21

> He comes in and has massive condyloma growing around his perirectal area. These things are bleeding and painful and preventing him from being able to work. He is going to need to have these surgically removed. We have been trying to treat him conservatively, without surgery, since June of this year. These are the largest condyloma that I have seen in my career. He will need to be hospitalized for a day or two following surgery. He will also need a procto to be sure these have not grown up into his rectum. . . .

(Tr. 133). The treatment note specifically states that further testing will need to be done prior to surgery to determine the scope of the treatment. Accordingly, it is not clear from the record that the plaintiff refused surgery, and there is no evidence of the surgical risk or the proposed outcome. As discussed above, more information is needed from Dr. Jordan in order for the ALJ to determine whether the plaintiff has refused to follow prescribed treatment.

The ALJ also cites to the plaintiff's refusal to use an "inflatable 'donut' when seated to alleviate pressure on his warts" (Tr. 20). However, there is no evidence that any treating doctor prescribed a donut; Dr. Hammond, in a consultative exam, stated that the plaintiff would "probably require a donut," but she did not prescribe such (Tr. 195). Further, the plaintiff testified that he borrowed a donut from a person at his church, but it was not effective. The plaintiff testified that the donut went "flat" (Tr. 264). As noted by the plaintiff, he weighs in excess of 300 pounds (pl. brief 13).

The plaintiff further argues that even assuming he did refuse surgery and the testing needed before surgery, the ALJ failed to follow the analysis required by SSR 96-7p to determine if there were good reasons for the lack of treatment. SSR 96-7p provides:

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in

22

order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility. For example:

* The individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms. The individual may be living with the symptoms, seeing a medical source only as needed for periodic evaluation and renewal of medications.

* The individual's symptoms may not be severe enough to prompt the individual to seek ongoing medical attention or may be relieved with over-the-counter medications.

* The individual may not take prescription medication because the side effects are less tolerable than the symptoms.

* The individual may be unable to afford treatment and may not have access to free or low-cost medical services.

* The individual may have been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual.

* Medical treatment may be contrary to the teaching and tenets of the individual's religion.

96-7p, 1996 WL 374186, at **7-8.

The plaintiff argues that the ALJ failed to consider the explanations he provided for the level of treatment he sought. For instance, the plaintiff testified that he did structure his daily activities to minimize his symptoms to a tolerable level: he avoided sitting, standing, or walking, and when at home, he usually was on his knees with his arms used to hold up his upper body weight and pillows used to keep his buttock cheeks separated so as not to put any more contact than necessary on the anal warts (Tr. 253, 255, 263-65). Further, the plaintiff testified that after defecation, the warts in his anus capture and hold feces (Tr. 261). He would then take a tub bath after a bowel movement to wash the feces from the areas around the warts (Tr. 251, 261). Other times, he has to have his wife perform this task (Tr. 263). Subsequent to either treatment, he exposes his perianal area to a fan to dry the area (Tr. 248). Further, the plaintiff testified that he was informed by Dr. Jordan that in spite of the surgery, the warts could return, calling into question the efficacy

of the cost, expense, and pain for the possible result (Tr. 195, 248). In addition, there was evidence that the plaintiff could not afford treatment, as he does not have insurance. The plaintiff's mother submitted an affidavit to the Appeals Council that she paid for the plaintiff's doctor visits, but she does not have money or insurance to pay for an operation (Tr. 224). While the defendant argues that since the plaintiff had money to pay for cigarettes (until he quit smoking in October 2003), he had money to pay for treatment, this is a post-hoc rationalization not offered by the ALJ. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

Based upon the foregoing, the ALJ should be instructed to perform the analysis required of SSR 82-59 and SSR 96-7p in considering the level of treatment sought by the plaintiff and the impact of such on the credibility of his claim of disability.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

February 5, 2009

Greenville, South Carolina